## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

DAWN M.HINDS,

          Claimant,

vs.

ANDREW M. SAUL,

Commissioner of Social Security,[1]

          Defendant.

No. 18-CV-3065-CJW

**REPORT AND RECOMMENDATION**

---

Plaintiff Dawn M. Hinds ("Claimant") seeks judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying her application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. Sections 401-34. Claimant contends that the Administrative Law Judge ("ALJ") erred in determining that she was not disabled. For the reasons that follow, I recommend that the District Court **affirm** the Commissioner's decision.

## I. BACKGROUND

I adopt the facts set forth in the Parties' Joint Statement of Facts (Doc. 11) and only summarize the pertinent facts here. This is an appeal from a denial of disability insurance benefits ("DIB"). Claimant was born on May 18, 1972. (AR[2] at 176.) Claimant is a high school graduate. (*Id.* at 213.) She allegedly became disabled due to

---

[1] After this case was filed, a new Commissioner of Social Security was confirmed. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul is substituted for Acting Commissioner Nancy A. Berryhill as the defendant in this suit.

[2] "AR" cites refer to pages in the Administrative Record.

depression, anxiety, and obesity. (*Id.* at 212.) Claimant's alleged onset of disability date was June 20, 2010. (*Id.* at 176.) Claimant filed an application for DIB on July 24, 2015. (*Id.*) Claimant's last date insured was September 30, 2015. (*Id.* at 12.) Claimant's claim was denied originally and on reconsideration. (*Id.* at 98-101, 106-09.) A video hearing was held on November 13, 2017 with Claimant, her attorney, Phillip Seidl, and hearing monitor Kathy Cameron in Davenport, Iowa; ALJ Gregory Smith in Orland Park, Illinois; and vocational expert ("VE") Gail Franklin appearing by telephone. (*Id.* at 28-66.) Claimant and the VE testified. (*Id.* at 33-65.) The ALJ issued an unfavorable decision on February 22, 2018. (*Id.* at 10-20.)

Claimant requested review, which the Appeals Council denied on September 24, 2018. (*Id.* at 1-5.) Accordingly, the ALJ's decision stands as the final administrative ruling in the matter and became the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481 (2019).

On November 26, 2018, Claimant timely filed her complaint in this Court. (Doc. 3.) On August 5, 2019, all briefing was completed and the Honorable C.J. Williams referred the case to me for a Report and Recommendation.

## II.   *DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF*

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant has a disability when, due to physical or mental impairments, the claimant

> is not only unable to do [the claimant's] previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). A claimant is not disabled if the claimant is able to do work that exists in the national economy but is unemployed due to an inability to find work, lack of options in the local area, technological changes in a particular industry, economic downturns, employer hiring practices, or other factors. 20 C.F.R. § 404.1566(c).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows the five-step sequential evaluation process outlined in the regulations. *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). At steps one through four, the claimant has the burden to prove he or she is disabled; at step five, the burden shifts to the Commissioner to prove there are jobs available in the national economy. *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).

At step one, the ALJ will consider whether a claimant is engaged in "substantial gainful activity." *Id.* If so, the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i). "Substantial activity is significant physical or mental work that is done on a full- or part-time basis. Gainful activity is simply work that is done for compensation." *Dukes v. Barnhart*, 436 F.3d 923, 927 (8th Cir. 2006) (citing *Comstock v. Chater*, 91 F.3d 1143, 1145 (8th Cir. 1996); 20 C.F.R. § 416.972(a),(b)).

If the claimant is not engaged in substantial gainful activity, at step two, the ALJ decides if the claimant's impairments are severe. 20 C.F.R. § 416.920(a)(4)(ii). If the impairments are not severe, then the claimant is not disabled. *Id.* An impairment is not severe if it does not significantly limit a claimant's "physical or mental ability to do basic work activities." *Id.* § 416.920(c). The ability to do basic work activities means the ability and aptitude necessary to perform most jobs. *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987) (quoting 20 C.F.R. §§ 404.1521(b), 416.921(b)). These include

> (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple

instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.

*Id.* (quotation omitted) (numbers added; internal brackets omitted).

If the claimant has a severe impairment, at step three, the ALJ will determine the medical severity of the impairment. 20 C.F.R. § 416.920(a)(4)(iii). If the impairment meets or equals one of the impairments listed in the regulations ("the listings"), then "the claimant is presumptively disabled without regard to age, education, and work experience." *Tate v. Apfel*, 167 F.3d 1191, 1196 (8th Cir. 1999) (quotation omitted).

If the claimant's impairment is severe, but it does not meet or equal an impairment in the listings, at step four, the ALJ will assess the claimant's residual functional capacity ("RFC") and the demands of the claimant's past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). RFC is what the claimant can still do despite his or her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing 20 C.F.R. §§ 404.1545(a), 416.945(a)). RFC is based on all relevant evidence and the claimant is responsible for providing the evidence the Commissioner will use to determine the RFC. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). "Past relevant work" is any work the claimant performed within the fifteen years prior to his application that was substantial gainful activity and lasted long enough for the claimant to learn how to do it. 20 C.F.R. § 416.960(b)(1). If a claimant retains enough RFC to perform past relevant work, then the claimant is not disabled. *Id.* § 416.920(a)(4)(iv).

At step five, if the claimant's RFC will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show there is other work the claimant can do, given the claimant's RFC, age, education, and work experience. *Id.* §§ 416.920(a)(4)(v), 416.960(c)(2). The ALJ must show not only that the claimant's

4

RFC will allow the claimant to do other work, but also that other work exists in significant numbers in the national economy. *Eichelberger*, 390 F.3d at 591 (citation omitted).

## A. The ALJ'S Findings

The ALJ made the following findings at each step of the five-step process regarding Claimant's disability status.

At step one, the ALJ found that although Claimant had worked since her alleged onset of disability date, she had not engaged in substantial gainful activity since the alleged onset date of June 20, 2010. (AR at 12.)

At step two, the ALJ found that Claimant suffered from the following severe impairments: degenerative disc disease of both knees, depression, anxiety, and obesity. (*Id.*)

At step three, the ALJ found that Claimant did not have an impairment or combination of impairments that met or equaled a presumptively disabling impairment listed in the regulations, either when considered singly or in combination. (*Id.*) The ALJ specifically considered listings 1.02 (Major dysfunction of a joint(s) (due to any cause)) for Claimant's knee replacement and considered the cumulative effects of Claimant's obesity because there is no listing for obesity. (*Id.* at 13.) The ALJ also considered listings 12.04 (depressive, bipolar and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), and 12.08 (personality and impulse-control disorders) singly and in combination as they related to Claimant's mental impairments. (*Id.* at 13-14.)

At step four, the ALJ found that Claimant had the following RFC:

[T]he claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she could only occasionally climb ramps and stairs. She could never climb ladders, ropes, or scaffolds. She could occasionally stoop, kneel, crouch, and crawl. She was limited to performing simple, routine tasks. She could . . . only have occasional

interaction with the public. She was limited to simple, work-related decisions.

(*Id.* at 14.)  The ALJ further found Claimant was unable to perform her past relevant work as an insurance clerk and or customer service representative.  (*Id.* at 18.)

At step five, the ALJ found there were jobs that existed in significant numbers in the national economy that Claimant could perform, including  parts inspector (*DOT* 806.687-030); printer helper (*DOT* 652.686-034); and shipping and receiving weigher (*DOT* 222.387-074). (*Id.* at 19.)  Therefore, the ALJ concluded that Claimant was not disabled during the relevant time period, which ended September 30, 2015.  (*Id.*)

## B.   *The Substantial Evidence Standard*

The ALJ's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Moore*, 572 F.3d at 522.  "The phrase 'substantial evidence' is a 'term of art' used throughout administrative law. . . . [T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations and quotations omitted). The court cannot disturb an ALJ's decision unless it falls outside this available "zone of choice" within which the ALJ can decide the case.  *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (citation omitted).  The decision is not outside that zone of choice simply because the court might have reached a different decision.  *Id.* (citing *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001)); *Moore*, 572 F.3d at 522 (holding that the court cannot reverse an ALJ's decision merely because substantial evidence would have supported an opposite decision).

In determining whether the Commissioner's decision meets this standard, the court considers all the evidence in the record, but does not reweigh the evidence.  *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005).  A court considers both evidence that

supports the ALJ's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [ALJ's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

## III. DISCUSSION

Claimant alleges the ALJ committed reversible error by (A) failing to support his decision to give Dr. Netolicky's opinion little weight, (B) failing to support his decision to give Dr. Taylor's opinion little weight, and (C) finding at step 5 that Claimant could perform work in the national economy when substantial evidence did support that finding. Claimant further argues the ALJ was not appointed in a constitutional manner, thus the ALJ's decision must be vacated and Claimant's case remanded so a properly-appointed ALJ may adjudicate the claim.

### A. The ALJ properly supported his decision to give Dr. Netolicky's opinion little weight.

Dr. Bryan Netolicky is Claimant's psychiatrist. Claimant began seeing Dr. Netolicky on June 17, 2011, shortly after she was in the hospital for treatment of anxiety and depression and continued to see her every four-to-six weeks through her last date insured. Dr. Netolicky wrote his opinion on November 8, 2017, which was more than two years after Claimant's last date insured. Dr. Netolicky provided his opinion on a standard check-box, short-answer form. (AR 1194-99.) He did, however, provide some explanation for several of his answers. Dr. Netolicky opined, in part, that Claimant would be unable to meet competitive standards or have no useful function in the following mental abilities related to work:

7

- Maintaining attention for a two-hour segment;
- Maintaining regular attendance and being punctual within customary, usually strict tolerances;
- Working in coordination with or proximity to others without being unduly distracted;
- Completing a normal workday and workweek without interruptions from psychologically-based symptoms
- Getting along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes;
- Responding to changes in a routine work setting; and
- Dealing with normal work stress.

He also found that Claimant seriously limited in the following abilities:

- Remembering work-like procedures;
- Sustaining an ordinary routine without special supervision;
- Asking simple questions or requesting assistance; and
- Accepting instructions and responding appropriately criticism from supervisors.

(*Id.* at 1196.) Dr. Netolicky further opined that Claimant's ability to interact with the public would be satisfactory "until a panic attack developed." (*Id.* at 1197.) He further opined that Claimant's anxiety would interfere with her ability to understand and carry out instructions. (*Id.* at 1196.) Dr Netolicky also stated that Claimant would find the following demands of work stressful: speed, complexity, deadlines, decision-making, exercising independent judgment, completing tasks, working with other people, dealing with the public (strangers), dealing with supervisors, being criticized by supervisors, simply knowing that work was supervised, getting to work regularly, remaining at work a full day, and fear of failure at work. (*Id.* at 1198.) Dr. Netolicky did not cite treatment notes or examples to support any of his opinions. Dr. Netolicky opined that Claimant would likely miss more than four days of work a month. (*Id.* at 1198.) He also stated that he had seen Claimant "struggle for years . . . despite medication interventions. I

believe limitations [and] impairments long preceded our initial visit of 6/17/11 but that was my [first] contact with her." (*Id.*)

The ALJ gave the opinion little weight in spite of Dr. Netolicky's long treatment relationship because Dr. Netolicky's "[treatment] notes and the overall record did not support such extreme limitations. Although [Claimant] experiences symptoms, . . . these are accommodated in the residual functional capacity." (*Id.* at 18.)

### 1. Legal Standard for Evaluating Dr. Netolicky's Opinion

"It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians." *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001) (noting internal citations omitted)). An ALJ must "give good reasons" for the weight given to a treating physician's opinion. 20 C.F.R. § 404.1527(c)(2). "A treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record as a whole.[3] *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010) (quotation omitted). "Even if the treating physician's opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight." *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015) (citation and brackets omitted). However, a treating physician's opinion can be given limited weight if it contains only conclusory statements, contains inconsistent opinions "that undermine the credibility of such opinions," is inconsistent with the record, or if other medical opinions are supported by "better or more thorough medical evidence." *Id.* (citations omitted).

---

[3] Under current regulations, a treating physician's opinion is entitled to no special deference. *See* 20 C.F.R. § 404.1520c(c). These regulations were effective as of March 27, 2017. *See* 20 C.F.R. § 404.1527. However, Claimant's claim was filed on July 24, 2015. Thus, the old regulations apply. *See id.*

Claimant argues that the "ALJ did not cite to any particular note or record to support his conclusion that the record did not support Dr. Netolicky's opinions concerning Ms. Hinds' limitations." (Doc. 12 at 5.) When a treating physician's medical opinion is not given controlling weight, the following factors will be examined to determine the weight to give the opinion: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors. 20 C.F.R. § 404.1527(c)(2).

### 2. Analysis

#### a. Length and Frequency of Treatment Relationship

"When the treating source has seen [the claimant] a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment, [the ALJ] will give the medical source's opinion more weight than . . . if it were from a nontreating source." 20 C.F.R. § 404.1527(c)(2)(i). As discussed above, the record contains dozens of treatment notes from Dr. Netolicky documenting years of treatment. This factor weighs in favor of giving the opinion more than little weight.

#### b. Nature and Extent of Treatment Relationship

"Generally, the more knowledge a treating source has about [a claimant's] impairment(s), the more weight [the ALJ] will give to the source's medical opinion." 20 C.F.R. § 404.1527(c)(2)(ii). In relevant part, Dr. Netolicky saw Claimant every four-to-six weeks from July 2011 to September 2015.[4] Therefore, this factor weighs in favor of giving the opinion more than little weight.

---

[4] Dr. Netolicky continued to see Claimant after her last date insured.

### c.    Supportability

"The better an explanation a source provides for a medical opinion, the more weight [the ALJ] will give that medical opinion." 20 C.F.R. § 404.1527(c)(3). "A treating physician's own inconsistency may . . . undermine his opinion and diminish or eliminate the weight given his opinions." *Hacker*, 459 F.3d at 937. In addition, "'[t]he checklist format, generality, and incompleteness of the assessments limit [an] assessment's evidentiary value.'" *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (quoting *Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001) (internal brackets omitted)); *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir.1996) ("A treating physician's opinion deserves no greater respect than any other physician's opinion when the treating physician's opinion consists of nothing more than vague, conclusory statements."); *see also Thomas v. Berryhill*, 881 F.3d 672, 675 (8th Cir. 2018) ("[Dr. Hollis's] assessments, however, consist of nothing more than vague, conclusory statements—checked boxes, circled answers, and brief fill-in-the-blank responses. They cite no medical evidence and provide little to no elaboration, and so they possess little evidentiary value. On that basis alone, the ALJ did not err in giving Dr. Hollis's RFC assessments little weight and relying more heavily on other opinions in the record.") (internal quotations and citations omitted). Therefore, a treating source's opinion can be given limited weight if it contains only conclusory statements or inconsistent opinions "that undermine the credibility of such opinions." *Papesh*, 786 F.3d at 1132 (quotation omitted).

This factor gets to the heart of Claimant's argument. Dr. Netolicky first treated Claimant on June 17, 2011, shortly after she was released from the hospital following an attempted suicide.[5] (*Id.* at 459.) Claimant wanted to transfer care from the Abbe Center, where she claimed she "wasn't getting her medications regularly or on time." (*Id.*) Dr.

---

[5] Dr. Netolicky stated that "thoughts of suicide" were in Claimant's past. (AR at 1195.)

Netolicky noted that Claimant had a history of recurrent depression beginning since at least age 15 when she made a suicide attempt by taking a "bunch" of Tylenol after a boyfriend broke up with her. (*Id.*) Claimant was feeling better since her release from the hospital, but said her anxiety was still "bad." (*Id.*) Claimant's anxiety began about a year earlier when one of her sixteen-year-old son's classmates was killed in a car accident. (*Id.*) Since that time, two other students from Claimant's area had died. (*Id.*) Claimant said that she is prone to just staying at home or in her bedroom, her "safe" places. (*Id.*) Her fear was that if she left home, something may happen to her son and she would not be there to help or even to hear about it. (*Id.*) Her anxiety magnified the further away she got from home. Claimant also claimed to have panic symptoms in crowded places such as Walmart. (*Id.*) She was taking "4 to 6 mg of Xanax in a matter of hours" to manage her anxiety. (*Id.*) At this appointment, Claimant was

> alert, oriented fully, and maintained good eye contact. . . . Mood was anxious and dysphoric.[6] Affect was restricted.[7] Speech was coherent and regular rate. No pressure. Language and concentration were grossly intact. Thoughts were linear. No suicidal or homicidal ideation. No auditory hallucinations, visual hallucinations, paranoia, or other psychotic thinking. Gait was steady and there were no clear tics or tremors. She broke into tears a few times. Judgment and insight were both fair.

(*Id.* at 460.) Dr. Netolicky diagnosed major depressive disorder, recurrent, moderate-to-severe without psychosis and anxiety disorder, not otherwise specified. (*Id.* at 461.) Claimant saw Dr. Netolicky dozens of times between this appointment and her date last

---

[6] Dysphoria is "[a] mood of general dissatisfaction, restlessness, depression, and anxiety; a feeling of unpleasantness or discomfort." *Stedman's Medical Dictionary* 599 (28th ed. 2006).

[7] A "restricted affect" is "a reduction in the intensity of affect, to a somewhat lesser degree than is characteristic of a blunted affect." *Durland's Illustrated Medical Dictionary* 35 (32d ed. 2012). A "blunted affect" is a "severe reduction in the intensity of affect; seen in schizophrenic disorders, frontotemporal dementia, and certain other conditions." *Id.*

insured for medication management.  The following is a summary of that treatment history.[8]

By her next appointment on July 8, 2011, Claimant stated that she found therapy "good" and felt she was "progressing."  (*Id.* at 459.)  Her mood was neutral and her affect was restricted.  (*Id.*)  Over the next few months, Claimant continued to do well in therapy and expressed anxiety over her son playing football and other issues related to her son, including his getting an OWI.  (*Id.* at 456-58.)  Dr. Netolicky labeled Claimant's stress "situational factors."  (*Id.* at 455.)   In November 2011, Claimant was upset with her father, a theme that would continue throughout her sessions with Dr. Netolicky, and continued to have anxiety because of her son's problems.  (*Id.* at 454.)

On December 8, 2011, Dr. Netolicky encouraged Claimant to get out and look for a job, but Claimant said that her father offered to pay her bills.  (*Id.* at 453.)  Dr. Netolicky encouraged Claimant to return to group therapy and to continue with individual therapy.  (*Id.*)  On February 9, 2012, Dr. Netolicky noted that Claimant was "resistant to 'look into that job thing' because [she was] anxious about it."  (*Id.* at 451.)  Dr. Netolicky encouraged her to focus on volunteering instead or to return to group therapy. (*Id.*)   In March 2012, Claimant was anxious about her son's impending high school graduation and how she would handle his going away to college and the future.  (*Id.* at 450.)  By May, Claimant still had not looked for work.  (*Id.* at 448.)  Dr. Netolicky encouraged her to "get out . . . look for a job or volunteer."  (*Id.*)

_____

[8] All but two of Dr. Netolicky's treatment notes are handwritten.  His penmanship is often difficult to decipher.  I have not attempted to include every treatment note, but have endeavored to include notes that fairly represent Claimant's treatment history and that I have interpreted correctly. Throughout the treatment history, Dr. Netolicky made changes to Claimant's medications as necessary.  I have not attempted to document those changes because the penmanship made dosages difficult to read.

13

On June 19, 2012, Claimant was experiencing situational stressors, but she "appear[ed] brighter" and was going out with friends occasionally. (*Id.* at 447.) Her father told her she had "four months," so she was looking for jobs. (*Id.*) Her mood was neutral and her affect was congruent. (*Id.*) On July 17, 2012, Claimant told Dr. Netolicky, she was "staying busy with the working from home thing" and getting out at least two times a week. (*Id.* at 446.) In September, she reported that things were good with her father because she was looking for work. (*Id.* at 444.) She had a job interview that morning. (*Id.*) Dr. Netolicky commented that Claimant seemed to generally be trying, although there was "still some resistance to getting a job." (*Id.*) Claimant's mood was neutral and her affect was full. (*Id.*)

On November 28, 2012, Claimant told Dr. Netolicky that she had been hired as a seasonal cashier at K-Mart and that her orientation was the next day. (*Id.* at 441.) Her son had been accepted to the University of Iowa for the next school year and her new interest was crocheting. (*Id.*) By December 27, 2012, Claimant was fired from K-Mart because she "couldn't stay there at work long enough." (*Id.* at 441.) She was looking for a work-from-home job. (*Id.*) In February 2013, Claimant stated that she went to Omaha for job training, but left early because she was worried about her son. (*Id.* at 439.) In March 2013, Claimant reported that she was no longer looking for work. (*Id.* at 438.) Throughout spring 2013, Claimant struggled with her son's graduation, independence, and impending move to college. (*Id.* at 433-36.) By October 2013, Claimant was able to limit herself to calling her son once a week, and Dr. Netolicky congratulated her on this achievement. (*Id.* at 431.)

In February 2014, Claimant reported that she was afraid to do things outside of her comfort zone (i.e., her room). (*Id.* at 373.) Her mood was anxious and her affect was congruent. On April 23, 2014, Claimant told Dr. Netolicky that she quit counseling because her counselor "bugged" her to attend group therapy. (*Id.* at 371.) Claimant's

mood was "relatively neutral" and her affect was full. (*Id.*) By August 2014, Claimant was getting along better with her father, who had hired someone to do repairs on Claimant's house. (*Id.* at 368-69.) Claimant said she did not like being in public places, but Dr. Netolicky encouraged her to get out more. (*Id.* at 368.) Her mood was neutral and her affect was full. (*Id.*) On November 21, 2014, Claimant was isolating herself more and avoiding crowds. (*Id.* at 365.) She still had not resumed therapy. (*Id.*) Dr. Netolicky strongly encouraged her to do so. (*Id.*) Her mood was anxious and her affect was relatively full. (*Id.*) By January 2015, Claimant was "planning" to return to therapy, but by February 2015, she was still only "considering" it. (*Id.* at 362-63.) Although Claimant said she had difficulty getting out of the house in February, Dr. Netolicky noted that she was "handling some stress better," had a neutral mood and a "pretty full affect." (*Id.* at 362.)

By May 6, 2015, Claimant was "managing" her anxiety, although it was not "perfect;" was feeling "not too bad;" and realized that her father "was one of [her] triggers." (*Id.* at 360.) Her mood was neutral and her affect was full. (*Id.*) On July 29, 2015, Claimant was doing "pretty good" with medication and had finally decided to resume therapy, but had not yet done so. (*Id.*) Claimant had apparently avoided her 25-year class reunion because of anxiety and, perhaps, avoided a paper delivery job, also.[9] (*Id.*) Claimant's mood was "mildly low" and her affect was somewhat restricted. (*Id.*) Dr. Netolicky encouraged Claimant to return to therapy. (*Id.*)

The last treatment note before Claimant's last date insured is from September 9, 2015. Claimant said she gets more anxious in the fall because high school football season reminded her of her son, who was then-currently doing great at the University. (*Id.* at 428.) Claimant was walking once-a-day to relieve anxiety and her symptoms remained

---

[9] These hand-written notes are particularly difficult to read.

unchanged. (*Id.*) Claimant had not started therapy. (*Id.*) Claimant's mood was a little anxious and her affect was full. (*Id.*) Her thoughts were linear; she had intact judgment and insight; and no psychosis or suicidal or homicidal ideation. Dr. Netolicky encouraged Claimant to continue walking and to resume therapy because it "helps when she is engaged in therapy."[10] (*Id.*)

In his opinion, Dr. Netolicky provided only check-marks in the portion of his opinion titled "[Claimant's] Mental Abilities and Aptitudes Needed to do Unskilled Work." (AR at 1196.) Although Dr. Netolicky supplemented this checkbox form with the blanket statement that "severe, persistent anxiety and mood instability have historically been severely limiting and have interfered with her ability to function in various domains, including work" (*Id.*), there are no citations to Dr. Netolicky's trove of treatment notes or examples from Dr. Netolicky's experiences with Claimant to support this broad statement. Moreover, Dr. Netolicky's treatment notes do not document mood instability. Claimant's moods mostly varied between "neutral" and "mildly low." Very rarely was Claimant's mood "mildly anxious" or "anxious." (*Id.* at 361, 364-65, 373, 428, 432.)

There is no indication in the treatment notes of Claimant's inability to work to speed or any level of complexity, meet deadlines, make decisions, exercise independent judgment, deal with supervisors, take criticism from supervisors, or work ineffectively simply because she knew she had a supervisor, and Dr. Netolicky provides no support for these checkbox diagnoses in his opinion. Claimant's ability to work from home, where she would be subject to all of these parameters; Dr. Netolicky's repeated encouragement for Claimant to get a job; and Claimant's seemingly best mental health

---

[10] There are several more treatment notes in the record, but they relate to the post-insured time period.

status when she was seeking employment, which also helped her relationship with her father, are also contrary to these checkbox diagnoses. To the extent Claimant's failed work experiments at K-Mart and in Omaha provide evidence of her inability get to work regularly or remain at work a full day, those work attempts were made when Claimant's son was still a minor living at home and Claimant rushed home because she was worried about him. Claimant's son moved away to attend college in fall 2013. Thus, rushing home to see to his safety is no longer a concern or an option, and was not for much of the relevant time period. Even during the time her son was in high school, Dr. Netolicky encouraged Claimant to look for work. Claimant made great strides early in her son's college career with not hovering by only phoning him once a week.

That home is her "safe space" and the place she prefers to be is relevant, but not dispositive. Dr. Netolicky never diagnosed Claimant with agoraphobia; consistently encouraged her to get out and engage with the world, either through therapy, walking her dog, job hunting, or volunteering. When Claimant was engaged with the world and looking for work, Dr. Netolicky noted better mental health. (*Id.* at 428, 447 (noting Claimant appeared "brighter" and was going out with friends and applying for jobs and that she did better when she was engaged in therapy).) At the last appointments during the relevant time period, Dr. Netolicky stated that walking helped Claimant managed her anxiety and encouraged her to return to therapy. (*Id.* at 326, 428.) Claimant's medications were working—she was "managing" her anxiety and feeling "pretty good." (*Id.* at 326.) An impairment that is controlled with treatment or medication is not considered disabling. *Brace v. Astrue*, 578 F.3d. 882, 885 (8th Cir. 2009) (citations omitted). Moreover, Claimant refused to return to therapy, in spite of Dr. Netolicky's

constant advice for her to do so.  This failure undermines Claimant's claims.[11]  *See Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004) ("failure to follow prescribed medical treatment without good cause is a basis for denying benefits") (citing *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995)).  Thus, I find that Dr. Netolicky's own treatment notes do not support his opinion.  In addition, the opinion was written over two years after Claimant's last date insured.  There is no indication whether Dr. Netolicky was specifically addressing Claimant's impairments during the relevant time period or during 2017 when he wrote the opinion.

Regarding Claimant's specific argument, I find that the ALJ did support his decision with citation to treatment notes in the record.  Claimant is correct that the ALJ cites mostly typed treatment notes, but the ALJ was not required to cite every piece of evidence in the record.  *See Wildman*, 596 F.3d at 966 (citing *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)) (an ALJ is not required to discuss every piece of evidence submitted).  Importantly, "[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered."  *Id.* (bracket in original).  I find the ALJ's citations and summary of Dr. Netolicky's treatment notes a fair representation of their overall content.  While it would have been preferable that the ALJ cite a specific treatment note on page AR 17, I note that the pages to which the ALJ was referring in this part of the decision included hand-written treatment notes.  (e.g., AR at 456-58.)  Therefore, "the ALJ's arguable deficiency in opinion-writing technique had no bearing on the

─────────────────

[11] Claimant makes no claim that she did not attend therapy because her impairment prevented her from doing so and has therefore waived this argument.  *See Gragg v. Astrue*, 615 F.3d 932, 938 (8th Cir. 2010) (noting that district court opined that although the claimant "discussed the Record at some length, he has not alleged any of the ALJ's findings regarding his physical capabilities or the effects of depression were erroneous" and holding that any arguments not properly raised at the district court level are waived on appeal) (citing *Flynn v. Chater*, 107 F.3d 617, 620 (8th Cir. 1997); *Novotny v. Chater*, 72 F.3d 669, 670 (8th Cir.1995)).  Furthermore, there is no support for this claim in Dr. Netolicky's treatment notes.

outcome of [the] case and does not require remand." *Buckner v. Astrue*, 646 F.3d 549, 560 (8th Cir. 2011) (internal quotation omitted). This factor does not weigh in favor of giving the opinion more than little weight.

### d.    Consistency

"Generally, the more consistent a medical opinion is with the record as a whole, the more weight [the ALJ] will give to that medical opinion." 20 C.F.R. § 404.1527(c)(4). The ALJ concluded that "the overall record does not support such extreme limitations" as Dr. Netolicky's opinion contained. (AR at 18.)

Claimant testified that during the relevant time period she would organize her errands so that she was not away from home more than three or four hours at a time and that she tries to do all her errands at one time to avoid being in stores more often than necessary. (*Id.* at 57-59.) She also testified that after her son went to college, she would text him or call him two-to-three-times-a-day up to several times-a-day if she heard sirens or if some tragedy occurred in her community that made her think of his safety. (*Id.* at 56-57.) If there were no emergency events to prompt crisis thinking, Claimant would call or text her son every-other-day. (*Id.* at 57.) She also testified that in June 2010, she tried working at APAC, a call center that handles prior authorizations for medical procedures. (*Id.* at 52.) She found the work too stressful because she had a time limit on the time she could spend on each call, she had to work between "three different screens," and angry physicians would yell at her. (*Id.* at 52-54.) After a total of three or four weeks employment, Claimant was fired from that job after taking several days off after having an anxiety attack at work. (*Id.* at 54-55.)

Claimant makes no substantive argument related to this factor and cites no evidence in the record as a whole that supports Dr. Netolicky's opinion. Rather, Claimant merely makes the following cursory argument: "[T]he ALJ's failure to provide good reasons supported by substantial evidence on the record as a whole  for assigning

little weight to Dr. Netolicky's opinions was not harmless. . . . [T]he opinions of Dr. Netolicky are well supported and consistent with the substantial evidence in the record." (Doc. 12 at 7.) Claimant cites no "substantial evidence in the record" that supports Dr. Netolicky's opinion. Contrary to Claimant's assertion, I find that the ALJ supported his decision by citing evidence from the St. Luke's Partial Hospitalization Program; Abbe Center; Dr. Netolicky; and Horizons, although the Horizons notes were for a time period after Claimant's date last insured. (AR at 15-16, 18.) The ALJ also cited Claimant's hearing testimony, her adult function report, the opinions of the state agency psychological consultants who reviewed the record, Claimant's son, and Claimant's friend. (13-15, 17-18.)

The Abbe Center notes in the record document anxiety over leaving the house for too long, but not an inability to do so. (*Id.* at 287-99.) On January 23, 2014, Claimant told her Abbe Center counselor that she begins feeling anxious if she is away from home more than two hours. (*Id.* at 287.) Her homework was to start spending 15 minutes more away from home every day. (*Id.*) All Abbe Center treatment notes documented Claimant's mental status/symptomology as "[a]nxious pleasant intelligent woman. . . . Oriented x3." (*Id.* at 287-99.) Claimant was never told to stay home or to limit herself from social interaction. On the contrary, she was encouraged to "keep at progressive desensitization" by progressively staying away from home a little longer every day. (*Id.* at 287-93.) This, apparently, is the therapy program that Claimant quit attending and that Dr. Netolicky encouraged her to return to.

Claimant's hearing testimony and function report also do not support the extreme limitations contained in Dr. Netolicky's opinion. Claimant filled out her function report on July 14, 2015 and stated that she stays in her room most of the day watching television, only leaving to let the dog out or in and to get something to eat. (*Id.* at 237.) She does, however, go shopping once a week for 30-to-45 minutes and testified that she tries to get

20

all her errands done in one day to cut down on the number of days she has to leave the house and tries to avoid crowds by shopping on weekdays rather than on the weekend. (*Id.* at 239, 59.) She also texts or talks with friends on the phone or visits with friends in person twice or three times a week. (*Id.* at 240.) She prefers to not go to other peoples' homes because she does not like to stay too long. (*Id.*) She communicates with her son just about as often. (*Id.*) Claimant stated that she has difficulty concentrating when it is loud, such as in a bar or bowling alley when there are a lot of people around. She has to read written instructions several times, but has no problems getting along with authority figures. (*Id.* at 241-42.) Claimant testified to the limitations discussed above. None of the limitations Claimant described in her function report or in her testimony support the extreme limitations Dr. Netolicky proffered in his opinion. Dr. Netolicky stated that Claimant would find the demands of working with supervisors stressful, something that Claimant stated she has no problems with. While Claimant said she had problems adjusting to her job at APAC, she said the problem was the technology and the quotas, along with the pace of working with three different screens at one time. She did not say that she was unable to get to work, complete a workday, or interact with supervisors or others in authority who were not yelling at her. (*Id.* at 52-54.) In fact, she testified that she was able to ask a team lead or one of her coworkers for help, although she realized that method of getting through the day was untenable because her coworkers had their own quotas to maintain. (*Id.* at 53.) This directly contradicts Dr. Netolicky's statement that Claimant's ability to ask questions or ask for assistance is seriously limited.

Regarding Claimant's testimony that she texts or communicates with her son two-to-three times a day or more when she is triggered into crisis thinking by a siren or other event, I find that four or more texts can be accommodated by normal work breaks, not to mention the time available during non-working hours. On non-crisis days, two texts

21

is nothing out of the ordinary for many parent-child long-distance relationships and does not interfere with either the parent's or the child's work schedules. Moreover, limiting Claimant to simple routine tasks and simple, work-related decisions will not require her to exercise independent judgment about information presented on multiple screens such as the type of work she was doing at APAC.[12] A Claimant's RFC is what she can do in spite of her limitations. *Guilliams*, 393 F.3d at 801. Claimant need not be symptom-free to be capable of working. Dr. Netolicky never noted that Claimant missed an appointment or was even late for an appointment due to her impairments. In addition, at her August 27, 2015 physical, Claimant was alert, had a normal mood and affect, normal behavior and thought content, and no suicidal ideas. (AR at 402.)

Psychologist Russel Lark, Ph.D., reviewed the record on September 1, 2015 and concluded, in relevant part, that Claimant had mild restriction in activities of daily living and maintaining social functioning; moderate restrictions in maintaining concentration, persistence, or pace and ability to interact appropriately with the general public; and no episodes of decompensation, each of extended duration and no significant limitations on her ability to get along with coworkers or peers without out distracting them. (*Id.* at 76-77.) Dr. Lark stated that Claimant was capable of completing 3-4 step tasks on a sustained basis. (*Id.* at 78.) On reconsideration on March 25, 2016, Mark Becker, Ph. D., noted that Claimant began therapy after her last date insured and reported that walking helps with her anxiety. (*Id.* at 94.) He affirmed Dr. Lark's opinion as written, but updated it to indicated Claimant's last date insured. (*Id.*) The ALJ gave the opinions some weight, however, he noted that "the overall evidence, including evidence at the

_____

[12] Although the VE testified that one of the jobs she proffered would likely involve "some computer interface," as discussed in part C, *infra*, the jobs proffered by the VE were all appropriate for Claimant's RFC. (AR at 64-65.)

hearing level, supports greater limitations such as those provided in the [RFC]." (*Id.* at 17.) I agree.

As will be discussed in more detail in part C, *infra*, the record as a whole does not support Claimant's interpretation of the ALJ's statement that the "record supports greater limitations." However, I find that substantial evidence on the record as a whole supports the ALJ's interpretation of the state agency reviewing psychologists' opinions and how they relate to Dr. Netolicky's opinion. Although the state agency reviewers did not review Dr. Netolicky's opinion because it had not been written at the time they reviewed the record, they did review treatment notes from Cedar Centre Psychiatric Group, Dr. Netolicky's place of employment. Therefore, it seems they reviewed the majority of Dr. Netolicky's treatment notes. The state agency reviewers' opinions are consistent with the rest of the record, which documents some limitations, but not the debilitating limitations that Dr. Netolicky claims Claimant suffers. Again, Claimant was consistently encouraged to get out and engage in the community, often expressly by looking for work. As the state agency reviewers noted, Claimant does not have problems with coworkers or supervisors, but may have problems working with the public. (*Id.* at 78, 94.) The reviewers also opined that Claimant's mental RFC was sufficient for her to complete non-complex tasks, in spite of the fact that her concentration might vary. (*Id.*) Claimant does not take issue with how the ALJ weighed the reviewers' opinions. As will be discussed below, her complaint is only with the origin of the "greater limitations" that became part of the RFC.

Finally, the ALJ gave the text message exchanges of support from Claimant's friend and her son some weight "to the extent they are supported by the objective medical evidence." I agree with the ALJ's decision. The text exchanges were short and somewhat descriptive. To the extent they describe anxiety symptoms that are supported by objective medical evidence, they should be given some weight. (*Id.* at 18.) Claimant

does not take issue with how the ALJ weighed these text messages of support. (*Id.* at 1211.)

Based on the above discussion, I find that this factor does not weigh in favor of giving the opinion more than little weight.

### e.    *Specialization*

"[G]enerally [the ALJ will give] more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(c)(5). Dr. Netolicky is a physician who specializes in psychiatry and gave an opinion in his area of expertise about a patient under his care. Therefore, this factor is weighs in favor of giving the opinion more than little weight.

### f.    *Conclusion*

After a thorough review of the entire record, I find that the ALJ's opinion regarding Dr. Netolicky's opinion is supported by substantial evidence on the record as a whole and should not be disturbed. I recommend that the ALJ's decision on this issue be affirmed.

**B.    *The ALJ properly supported his decision to give Dr. Taylor's opinion little weight.***

Regardless of its source, an ALJ will evaluate every medical opinion receive[d]. 20 C.F.R. § 404.1527. ALJs consider the same factors they consider when deciding the weight to give treating physician opinions when deciding the weight to give other medical opinions. *Id.*

Dr. Taylor examined Claimant on November 19, 2015 at the request of the Social Security Administration ("SSA") to determine the extent of Claimant's physical impairments. He issued his report on November 30, 2015. (AR at 391-95.) Dr. Taylor opined that Claimant would have the following functional restrictions: She would have

24

no sitting restrictions; could occasionally use her lower extremities; could frequently to continuously use her upper extremities and grip. She would be limited to rare or occasional standing, stooping, and bending; could rarely walk, kneel, or use stairs; and could never crawl or be on uneven surfaces. (*Id.* at 394.) Dr. Taylor opined that Claimant should have the ability to sit when necessary during periods of standing or walking and should be limited to lifting 20-30 pounds on a rare basis. (*Id.*) Dr. Taylor also stated that Claimant had "other health issues related to her obesity and becomes fairly short of breath and fatigued." (*Id.* at 395.) Claimant was able to get on and off the examination table with mild difficulty, could squat three-quarters of the way down with the table, was able to take a few steps on her heels and toes, and walked around the examination room with a gait pattern that revealed that she walked on the outside of her right foot and on the inside of her left foot. (*Id.* at 393.) Claimant had no difficulties during the examination, her straight leg raising was negative and her seated straight leg raising was negative. (*Id.* at 391, 393.) Claimant's knees were symmetrical with no effusions, her ligaments were intact, and there was no joint line tenderness in either knee. (*Id.* at 393.) Claimant had no anterior or posterior knee pain, but did have bilateral crepitation, which was worse in her left knee than her right. (*Id.*) No erythema or knee joint enlargement was noted. (*Id.*) Twice in his opinion, Dr. Taylor noted that Claimant was mainly applying for disability based on claims of anxiety and depression. (*Id.* at 391, 395.)

The ALJ gave the opinion little weight because it was "not supported by Dr. Taylor's examination of the claimant. . . . [and because] it does not provide functional limitations." (*Id.* at 17.) The ALJ opined that "it is not supported that claimant can rarely stand and walk. As indicated in the file, the claimant walks for exercise. Further, the undersigned notes that this exam and opinion were done after the date late insured." (*Id.* at 17-18.)

### 1. Length and Frequency of Treatment Relationship

"When the treating source has seen [the claimant] a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment, [the ALJ] will give the medical source's opinion more weight than . . . if it were from a nontreating source." 20 C.F.R. § 404.1527(c)(2)(i). Dr. Taylor saw Claimant once for a consultative examination. Dr. Taylor informed Claimant that the examination did not create a patient/treating physician relationship. (AR at 391.) Therefore, this factor does not weigh in favor of giving the opinion more than little weight.

### 2. Nature and Extent of Treatment Relationship

"Generally, the more knowledge a treating source has about [a claimant's] impairment(s), the more weight [the ALJ] will give to the source's medical opinion." 20 C.F.R. § 404.1527(c)(2)(ii). As described above, Dr. Taylor saw Claimant once and did not establish a treating relationship with her. This factor does not weigh in favor of giving the opinion more than little weight.

### 3. Supportability

"The better an explanation a source provides for a medical opinion, the more weight [the ALJ] will give that medical opinion." 20 C.F.R. § 404.1527(c)(3).

The ALJ found that Dr. Taylor's own examination notes did not support his opinion. Dr. Taylor put severe limitations on Claimant's walking abilities. However, the only things related to Claimant's abilities to walk in the report were her uneven gait related to how she distributes her weight on her feet. (AR at 393.) Claimant reported to Dr. Taylor that she is able to walk a block before she is tired and that she can climb a flight of stairs. (*Id.* at 391.) The worst knee pain she reported "can increase up to 5 or 6 out of 10." (*Id.*) She had "mild" difficulty getting on and off the examination table and normal strength in her lower extremities. (*Id.* at 395-96.) Dr. Taylor also noted that Claimant's obesity caused her to be short of breath and fatigued and opined this would

affect her "material handling abilities," not her walking abilities.  (*Id.* at 395.)  Because of her obesity, Dr. Taylor limited Claimant to lifting and carrying 20-30 pounds rarely. (*Id.* at 394.)  However, Dr. Taylor found both Claimant's upper extremity and grip strength to be 5/5.  (*Id.* at 396.)   There is no record of Claimant performing any lifting or weight-carrying tests during her examination with Dr. Taylor.  Therefore, I find that Dr. Taylor's extreme limitations on Claimant's lifting and carrying are not supported by his treatment notes, even though Dr. Taylor does tie the limitations to Claimant's obesity.

The ALJ's finding that Dr. Taylor did not provide functional limitations is puzzling because the ALJ recited what I, and I assume Claimant, considered functional limitations as part of Dr. Taylor's opinion.  (*Id.* at 17.)  These limitations appear in the part of Dr. Taylor's opinion called "Restrictions" on a grid upon which Dr. Taylor checked off how often Claimant could engage in various activities: not at all ("none"), rarely, occasionally, frequently, continuously, or "no restrictions."  (*Id.* at 394.)  The activities Dr. Taylor ranked on the grid included such things as sitting, standing, walking, stooping, bending, crawling, kneeling, uneven surfaces, ladders, and stairs, all of which are typically included in functional limitation assessments.  (*Id.*)  Therefore, I find that the ALJ erred in finding that Dr. Taylor failed to provided functional limitations.  However, I find the error did not affect the ALJ's overall assessment of Dr. Taylor's opinion because Dr. Taylor obviously read and evaluated this part of the opinion and because the ALJ's assessment regarding whether Dr. Taylor's opinion is supported by his treatment notes is correct.

Finally, I do not find the fact that the opinion was written two months after Claimant's date last insured to be problematic in this case.  Claimant was required to attend this consulting examination, which was ordered by the SSA.  Claimant had no control over when the examination was scheduled and should not be disadvantaged because of its timing.

On the whole, this factor weighs against giving the opinion more than little weight.

### 4.    Consistency

"Generally, the more consistent a medical opinion is with the record as a whole, the more weight [the ALJ] will give to that medical opinion." 20 C.F.R. § 404.1527(c)(4).

The ALJ gave the opinion little weight, in part, because the Claimant walks for exercise.  (AR at 17-18.)   As discussed above, this conclusion is supported by Dr. Netolicky's treatment notes.  (*Id.* at 428.)   On July 23, 2014, Claimant saw Dr. Jamie Wallace for knee pain.  (*Id.* at 341.)  Dr. Wallace prescribed diclofenac potassium pills for Claimant to take for ten-to-fifteen days.  (*Id.*)  Claimant did not seek further treatment for knee pain.  At her August 2015 physical, Claimant had a normal range of motion with no edema or tenderness.  (*Id.*  at 402.)  On December 22, 2015, Claimant had x-rays taken of both knees.  (*Id.* at 407.)  They showed there was no acute abnormality  in her knees and only mild degenerative changes bilaterally.   (*Id.*)

On January 1, 2016, Donald Shumate, D.O., reviewed the record for the state agency.  Dr. Shumate opined, in relevant part, that Claimant had the RFC to stand and/or walk about six hours a day; sit about six hours a day; occasionally climb ramps/stairs, kneel, crouch, stoop, and crawl; and never climb ladders, ropes, or scaffolds.  (*Id.* at 75.)  Dr. Shumate noted that Claimant can perform all self-cares, prepare meals, mow her yard, do laundry, clean house, drive, and shop.  (*Id.* at 76.)  On March 23, 2016, Chrystalla Daly, D.O, affirmed Dr. Shumate's opinion on reconsideration and noted that since Dr. Shumate's review, Claimant had been trying to exercise more.  (*Id.* at 92.)

The reviewing physicians' opinions and the objective medical evidence support the ALJ's decision.  There is no support in the record for the extreme walking limitations Dr. Taylor placed on Claimant.  Claimant, herself, downplayed the seriousness of her physical impairments, explaining to Dr. Taylor that her disability claim was based

primarily on her mental health issues. In addition, as noted by Dr. Shamate, Claimant reported in her function report that she takes care of all her own personal care needs and her own housework and yard work. (*Id.* at 237-38.) Therefore, I find this factor does not weigh in favor of giving the opinion more than little weight.

### 5. Specialization

"[G]enerally [the ALJ will give] more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(c)(5). Dr. Taylor is a physician who has a certification as a CIME, a certified independent medical examiner. (AR at 391.) He is also a Fellow of the American College of Occupational and Environmental Medicine. (*Id.*) Dr. Taylor was therefore working in his areas of expertise when he rendered his opinion in this case. This factor weighs in favor of giving the opinion more than little weight.

### 6. Conclusion

After a thorough review of the entire record, I find that the ALJ's decision regarding the opinion is supported by substantial evidence on the record as a whole and should not be disturbed. I recommend that the ALJ's decision on this issue be affirmed.

### C. Substantial evidence supports the ALJ's step-five finding that Claimant was not disabled because there was work she could perform in the national economy.

The ALJ posed one hypothetical to the VE, and that hypothetical became the RFC in this case:

> [T]he claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she could only occasionally climb ramps and stairs. She could never climb ladders, ropes, or scaffolds. She could occasionally stoop, kneel, crouch, and crawl. She was limited to performing simple, routine tasks. She could . . . only have occasional interaction with the public. She was limited to simple, work-related decisions.

29

(*Id.* at 14.)  Claimant argues the following:

> The ALJ explained as follows how he weighed the opinions of the State
> agency psychologists: "The consultants opined that the claimant is capable
> of completing 3-4 step tasks on a sustained basis (Ex. B2A, B4A). These
> opinions are assigned some weight, however, the overall evidence,
> including evidence received at the hearing level, *supports greater
> limitations such as those provided in the residual functional capacity."* (TR
> 17) (emphasis added). The ALJ essentially explained he was further limiting
> Ms. Hinds to 1-2 step tasks—which limits a claimant to Reasoning Level 1
> jobs per the Dictionary of Occupational Titles.

(Doc. 12 at 10-11) (emphasis in original).  Claimant is taking this quote out of context.

What the ALJ actually said follows:

> The state agency psychological consultants found that the claimant has mild
> restriction in activities of daily living, mild restriction in maintaining social
> functioning, moderate restriction in maintaining concentration, persistence
> or pace, and no episodes of decompensation, each of extended duration.
> The consultants opined that the claimant is capable of completing 3-4 step
> tasks on a sustained basis (Ex. B2A, B4A). These opinions are assigned
> some weight, however, the overall evidence, including evidence received
> at the hearing level, supports greater limitations such as those provided in
> the residual functional) capacity.

(AR at 17.)  Thus, rather than limiting only the 3-4 step portion of the psychological
consultants' opinions, which would result in an absurd reading of the final RFC because
it would require the court to impute a 1-2 step limitation that is clearly not included, the
ALJ was actually referring back to the consulting psychologists' *entire* opinions.  The
ALJ's further limitations include "only occasional interaction with the public" and
"[making] only simple work-related decisions" because those limitations were not

included in the state agency psychological consultants' opinions that he gave great weight.[13]

For support, Claimant relies on *Thomas v. Berryhill*, which held that there was a conflict between the claimant's RFC, which limited her to jobs requiring "rote '1 to 2 step tasks'" with "few variables and little judgment" and a job involving level-three reasoning. 881 F.3d at 676-78. The court held that by "incorporating the definition of level-one reasoning into the RFC, the ALJ indicated 'that [Thomas] could perform only occupations at [that] reasoning level' and "[b]ecause that conflict was 'apparent' and not just 'possible,' the ALJ needed to do more than have the expert affirm that his testimony was consistent with the *DOT*." *Id.* at 678 (quoting *Moore v. Astrue*, 623 F.3d 599, 604 (8th Cir. 2010); *Moore v. Colvin*, 769 F.3d 987, 990 (8th Cir. 2014)).

*Thomas* can be distinguished from the case at bar. *Thomas* focused specifically on instructions—the instructions included in the claimant's RFC versus the instructions that workers in reasoning level 3 jobs are expected to understand and execute. Here, the comparison is not apt. Claimant's RFC does not contain a limitation regarding the instructions Claimant can understand and successfully execute. Thus, *Thomas* is not a useful case for resolving the conflict at bar.

Claimant also relies on *Stanton v. Comm'r, Soc. Sec. Admin.*, which held there was an apparent unresolved conflict between an RFC that limited the claimant to jobs with "simple one-to-two-step instructions" and the level 2 reasoning jobs identified by the VE. 899 F.3d 555, 559-60 (8th Cir. 2018). *Stanton* also stated that in this situation, VE testimony that his statements were consistent with the *DOT* was insufficient to explain the conflict between the reasoning level required for level 2 jobs and the RFC's "simple

---

[13] The state agency psychological consultants did note that Claimant's anxiety "may not allow her to work closely with the public. Nevertheless, she has gotten along well with her providers and did not report any significant problems getting along with others." (AR at 78, 94.)

one-to-two step instruction" requirement. *Id.* at 559. For the same reason that *Thomas* is not a useful case for resolving the instant conflict, *Stanton* is, likewise, not a useful case.

Claimant argues that the ALJ in the case at bar "essentially explained he was further limiting Ms. Hinds to 1-2 step tasks—which limits a claimant to Reasoning level 1 jobs per the *Dictionary of Occupational Titles*." (Doc. 12 at 11 (citing *Thomas*, 881 F.3d at 676-78 and *Stanton*, 899 F.3d at 559-60).) I do not agree.

In *Moore v. Astrue*, another case cited by Claimant, the Eighth Circuit rejected the argument that an RFC limiting a claimant to "carrying out simple job instructions" and performing "simple, routine and repetitive work activity at the unskilled task level" was incompatible with jobs requiring level 2 reasoning. 623 F.3d 599, 604 (8th Cir. 2010). The claimant in *Moore* argued that the requirements of his RFC could only be satisfied with jobs requiring level 1 reasoning, "defined in the *DOT* as the ability to '[a]pply commonsense understanding to carry out simple one- or two-step instructions.'" *Id.* (quoting *DOT*) (bracket in original). In affirming the ALJ's decision, *Moore* reasoned as follows:

> [T]he ALJ did not limit "simple" job instructions to "simple *one- or two-step* instructions" or otherwise indicate that Moore could perform only occupations at a *DOT* Level 1 reasoning level. Indeed, the Level 2 reasoning definition refers to "detailed but *uninvolved*" instructions. *DOT* at 1011 (emphasis added). The dictionary defines "uninvolved" as "not involved," and in turn defines "involved" as "complicated, intricate." *Webster's Third New Int'l Dictionary* 1191, 2499 (2002). There is no direct conflict between "carrying out simple job instructions" for "simple, routine and repetitive work activity," as in the hypothetical, and the vocational expert's identification of occupations involving instructions that, while potentially detailed, are not complicated or intricate.

*Id. Moore* also reiterated the rules that *DOT* job descriptions provide maximum job requirements and that without evidence to the contrary, there is no reason to believe the

VE did not consider all the limitations provided in a hypothetical when presenting job possibilities:

> Moreover, the Level 2 reasoning definition is an upper limit across all jobs in the occupational category, not a requirement of every job within the category. "[A] claimant's reliance on the *DOT* as a definitive authority on job requirements is misplaced because *DOT* definitions are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range." *Page* [*v. Astrue*, 484 F.3d 1040], 1045 [(8th Cir. 2007)]. "The *DOT* itself cautions that its descriptions may not coincide in every respect with the content of jobs as performed in particular establishments or at certain localities." *Wheeler v. Apfel*, 224 F.3d 891, 897 (8th Cir. 2000); *see DOT* at xiii. "In other words, not all of the jobs in every category have requirements identical to or as rigorous as those listed in the *DOT*." *Wheeler*, 224 F.3d at 897. There is nothing in the record to suggest that the vocational expert ignored the reasoning limitations in the hypothetical in determining that the listed occupations encompassed suitable jobs. *See Whitehouse v. Sullivan*, 949 F.2d 1005, 1006 (8th Cir. 1991) ("[T]he ALJ could properly assume that the expert framed his answers based on the factors the ALJ told him to take into account."). Because substantial evidence supports the ALJ's phrasing of the hypothetical to the vocational expert, and there was no conflict between the vocational expert's testimony and the *DOT*, the ALJ properly relied on the testimony. *See Page*, 484 F.3d at 1045.

*Id.* at 604–05 (most brackets in original; brackets in *Page* citation added); *Hall v. Saul*, No. 18-CV-2032-LTS-KEM, 2019 WL 5085427, at *16 (N.D. Iowa Oct. 10, 2019) (discussing reliance on *DOT* as a definitive source of job requirements).

Like the hypothetical in *Moore* that did not include a specific limitation to 1-2-step instructions, the hypothetical in the case at bar did not include a 1-2 step limitation. As *Moore* cautions, the Court is not to write into a hypothetical that which the ALJ did not write in himself. Thus, Claimant's attempt to impute a 1-to-2-step limitation where none exists is without merit.

Claimant also takes issue with each of the particular jobs proffered by the VE. I will address each job in turn. Claimant first argues that *DOT* 806.687-030 (inspector, bicycle)[14] conflicts with her RFC because the job requires level 2 reasoning, which is inconsistent with her RFC "when considering the ALJ was accounting for a 1-2 step instruction limitation." (Doc. 12 at 11.)

First, as discussed, the ALJ was not "accounting for a 1-2 step instruction limitation" in Claimant's RFC. Second, as *Moore* stated, "not all of the jobs in every category have requirements identical to or as rigorous as those listed in the *DOT*. . . . There is nothing in the record to suggest that the vocational expert ignored the reasoning limitations in the hypothetical in determining that the listed occupations encompassed suitable jobs." 623 F.3d at 604 (citations omitted). In the instant case, Claimant's attorney at the hearing, Mr. Seidl, made no objection to the VE's qualifications and asked no questions regarding the instructions or reasoning levels when given time to question the VE during the hearing. (AR at 61, 64.) Mr. Seidl is co-counsel in Claimant's current appeal. Thus, I assume he is not suggesting the VE ignored the reasoning limitations in the hypothetical or was not qualified in some other way to offer an opinion in this case.

Third, and more importantly, *Moore* held that reasoning level 2 jobs were not inappropriate for someone with an RFC limiting the claimant to "simple job instructions" for "simple, routine and repetitive work activity." 623 F.3d at 604 (reasoning that the ALJ did not limit "simple" instructions to "simple one-or two-step instructions" or otherwise indicate the claimant could perform only occupations at *DOT* level 1 reasoning). Thus, the job of bicycle inspector does not conflict with Claimant's RFC.

---

[14] The VE and ALJ call this job "parts inspector."

Claimant also argues that *DOT* 222.387-074 (shipping and receiving weigher), a job requiring level 3 reasoning, is inappropriate for her RFC for the same reason—considering the ALJ was accounting for a 1-2 step limitation. Again, the ALJ did not include a 1-2 step limitation in the RFC, so that argument is without merit. The Commissioner asserts that *Welsh v. Colvin* 765 F.3d 926, 930 (8th Cir. 2014) controls this issue. (Doc. 13 at 16.)

In *Welsh*, the ALJ held a hearing pursuant to a remand because the original ALJ failed to resolve inconsistencies between the testimony of the VE and *DOT* work descriptions of jobs the VE proffered. 765 F.3d at 927. At the second hearing, the ALJ "more thoroughly questioned the VE regarding her opinion that Welsh could perform sedentary work as a surveillance systems monitor and call out operator," specifically asking questions about apparent inconsistencies between the lifting, fingering, and handling demands of the jobs at issue and the claimant's impairments. *Id.* at 927-28. The ALJ did not ask about the reasoning levels of the jobs at issue, although that was one of the issues the claimant eventually appealed to the courts. *Id.* at 927-29. The Eighth Circuit affirmed the decision of the ALJ to deny benefits, holding that when an ALJ's hypothetical accurately reflected his RFC finding, the ALJ questioned the VE about any apparent inconsistencies with the relevant *DOT* job descriptions, and the ALJ explained his decision to credit the VE's testimony, the ALJ had complied with SSA rules. *Id.* at 930.

Unlike the situation in *Welsh*, in the case at bar, there were no apparent inconsistencies between the jobs proffered by the VE and Claimant's RFC. Although Claimant wants to impute a 1-2-step reasoning limit into her RFC, that limit does not exist. Accordingly, just as the ALJ was not required to resolve a non-existing or merely potential conflict regarding a level 3 reasoning job in *Welsh*, the ALJ in this case was also not required to resolve a non-existing or merely potential conflict with a level 3

reasoning job. *See id.* ("[A]n ALJ's failure to address any potential conflict between a limitation to simple, routine, and repetitive work, to which the ALJ limited plaintiff here, and jobs requiring level-three reasoning does not require remand.") The ALJ was allowed to assume the VE considered all the limitations contained in the hypothetical when proffering appropriate jobs for Claimant. *Whitehouse v. Sullivan*, 949 F.2d 1005, 1006 (8th Cir. 1991) ("[T]he ALJ could properly assume that the expert framed his answers based on the factors the ALJ told him to take into account."). Therefore, I find that the level 3 job of shipping and receiving weigher was also an appropriate job for Claimant.

Even if the level 3 job was not an appropriate job for Claimant, I find that remand would not be necessary. There are only 29,000 of these positions nationally. (AR at 19.) If these positions are not included in the total number of representative positions available to Claimant, there are still 179,000 total jobs available, which is a significant number of jobs. *See Welsh*, 765 F.3d at 930 (holding that 36,000 jobs constituted a significant number of jobs).

Finally, Claimant makes a tortured argument related to *DOT* 652.686-034 (printer helper), arguing there is no position with this exact name in the *DOT*, but conceding that the position identified with this *DOT* number, raised printer, is a reasoning level 1 job, which Claimant could not take issue with. (Doc. 12 at 11.) Claimant, however, goes on to argue that screen-printing-machine-operator-helper (textile), "which the vocational expert seems to have been referring to as this job can fairly be characterized as a printer helper, which is *almost* the exact same *DOT* code . . . except that it ends in an '8' instead of a '4,'" is a reasoning level 2 job, which Claimant argues is in conflict with her apparent limitation to reasoning level 1 jobs. (*Id.* at 11-12 (emphasis in original).) Claimant then picks up the generic *DOT* definition of "helper" that applies to any industry, even though the VE was clear at the hearing that she was talking about a job in the printing industry,

and makes the argument that the VE was proffering "helper," a level 2 reasoning job, as a job for Claimant. (*Id.* at 12; AR at 63.)

I find that the VE proffered a job in the printing industry rather than a generic "helper" job, and that the VE proffered the raised printer job rather than the screen printer helper job because (1) that is the job that matches the *DOT* number the VE recited at the hearing; (2) the VE mentioned "printer" at the hearing; and (3) the screen printer helper job is a medium strength-rated job, which does not meet the requirements of the hypothetical. *See DOT*, CODE: 653.686-038 TITLE: SCREEN-PRINTING-MACHINE-OPERATOR-HELPER, https:// occupationalinfo.org/ 652686038.html. Following the reasoning of *Whitehouse*, I assume the VE only provided jobs that met the requirements of the hypothetical posited by the ALJ. 949 F.2d at 1006. There is no evidence to the contrary in the record and Claimant's counsel did not raise any objection to the jobs at the hearing, although he did ask a question about the jobs' potential computer use requirements and the need "to navigate screens." (AR at 64.) The VE answered, "[T]he printer helper would probably require some computer interface." (*Id.* at 65.) Thus, the level 1 reasoning required for the raised printer job, or "printer helper job," is in concert with Claimant's view of her own limitations.[15]

---

[15] In addition, the O*Net crosswalk definition for the raised printer job is machine feeders and offbearers, which is defined as, "[f]eed[s] materials into or remove[s] materials from machines or equipment that is automatic or tended by other workers," which is a "helper" position. O*Net, CODE: 98502, https://occupationalinfo.org/onet/98502.html. *See also DOT*, CODE: 653.686-034, TITLE: RAISED PRINTER (print. & pub.), https://occupationalinfo. org/65/652686034.html. Moreover, that the printer helper job would likely require "some computer interface" makes this cross reference to O*Net likely because one of the knowledge requirements for the job is knowledge of word processing systems. *Id.*

I realize that O*Net definitions have not be adopted for use by the SSA. *See Postel v. Saul*, No. 18-CV-2017-MAR, 2019 WL 4720990, at *25 (N.D. Iowa Sept. 26, 2019) (explaining that O*Net does not appear on the list of publications "from which the [SSA] can take 'administrative notice of reliable job information'") (quoting *Jeffries v. Berryhill*, No. 1:18-cv-51, 2019 WL

Accordingly, I find that there is no unresolved conflict between Claimant's RFC and the reasoning level requirements of the jobs relied on to deny benefits. The ALJ's step 5 decision that there are jobs in the national economy Claimant can perform is supported by substantial evidence in the record. I recommend the District Court affirm the ALJ's decision on this issue.

### D. *Claimant failed to timely raise her Appointments Clause argument under* **Lucia v. SEC.**

In *Lucia v. SEC*, the Supreme Court held that ALJs of the Securities and Exchange Commission are "Officers of the United States" within the meaning of the Appointments Clause, and, therefore, the President, a court of law, or department head must appoint them. 138 S. Ct. at 2049. Claimant argues that SSA ALJs should be treated as improperly appointed "inferior officers" like the SEC ALJs in *Lucia*. (Doc. 12 at 13-21.) Claimant asserts this Court should vacate the denial of benefits by ALJ Smith and remand the case for decision by what she contends is a properly-appointed ALJ. (*Id.* at 13.) Claimant admits she is asserting this Appointments Clause challenge for the first time in her brief to this Court. (*Id.* at 14, 15.)

Claimant's case presents a slight procedural difference from cases that I have previously addressed on this issue. In this case, the Appeals Council denied review of the ALJ's decision after *Lucia* was decided on June 21, 2018. The Appeals Council denied Claimant review on September 24, 2018. (AR at 1-2.) However, that procedural difference did not change the arguments proffered by Claimant and does not change my recommendation. It does, however, change part of the final reasoning for my recommendation

---

1005501, at *8 (M.D.N.C. Mar. 1, 2019) (quoting *Malfer v. Colvin*, Civ. No. 12-169J, 2013 WL 5375775, at *5 (W.D. Pa. Sept. 24, 2013)). I only offer this definition as a possible explanation for how the VE may have come to the term "printer helper." O*Net is a Department of Labor website with which the VE is likely familiar.

Claimant asserts that her case can be distinguished from many of the earliest cases addressing this issue because the earlier cases were decided before EM-18003 was issued by the SSA and before former Acting Commissioner Berryhill's authority lapsed, which "led the SSA to lack a Department Head that could provide a remedy for an Appointments Clause challenge." (Doc. 12 at 13.) For support, Claimant cites SSR 19-1p, 2019 WL 1202036, Effect of the Decision in *Lucia v. Securities and Exchange Commission (SEC)* on Cases Pending at the Appeals Council. (Doc. 14 at 6.) However, SSR 19-1p is inapplicable to Claimant's case because the ruling only applies to challenges timely raised before the Appeals Council or previously raised at the ALJ level. 2019 WL 1202036, at *9583; *see also Murphy v. Comm'r of Soc. Sec.*, No. 18-CV-61-LRR, 2019 WL 2372896, at *7 (N.D. Iowa April 10, 2019) (addressing SSR 19-1p and holding that claimant waived *Lucia* issue when she raised it for the first time in the district court), *appeal docketed*, No. 19-2202 (8th Cir. June 12, 2019).

Claimant also cites *Bizarre v. Berryhill*, 364 F. Supp. 3d 418 (M.D. Pa. 2019), *affirmed*, *Cirko on behalf of Cirko v. Comm'r of Soc. Sec.*, No. 19-1772, -- F.3d --, 2020 WL 370832 (3d Cir. Jan. 23, 2020); *Probst v. Berryhill*, No. 5:18-cv-130-JG, 2019 WL 1749135 (E.D.N.C. March 22, 2019), *appeal docketed*, *sub nom Probst v. Saul*, No. 19-1529 (4th Cir. May 17, 2019); and other cases from those districts and encourages the Court to adopt *Bizarre's* reasoning in this case. (Doc. 12 at 15.) The *Bizarre* court held that it did "not believe that [the claimant] was required to raise her [Appointments Clause challenge] before the ALJ or Appeals Council in the first instance or that failure to do so worked a forfeiture of that claim." *Id.* at 425. I respectfully disagree and decline to adopt the *Bizarre* court's holding. Instead, I agree with the holding in *Murphy*: "[T]he court respectfully disagrees with the *Bizarre* court's holding. This court believes that failure to raise an Appointments Clause challenge before the ALJ or Appeals Council at the agency level waives the issue on judicial review at the district court level." 2019 WL

39

2372896, at *7 (citing *NLRB v. RELCO Locomotives, Inc.*, 734 F.3d 764, 798 (8th Cir. 2013); *Anderson v. Barnhart*, 344 F.3d 809, 814) (8th Cir. 2003)).

This Court has ruled in favor of the Commissioner on similar claims on several occasions. *See Hall v. Saul*, No. 18-CV-2032-LTS-KEM, 2019 WL 5085427, at *16 (N.D. Iowa Oct. 10, 2019); *Gilbert v. Saul*, No. C18-2045-LTS, 2019 WL 4751552, at *20 (N.D. Iowa Sept. 30, 2019); *Squier v. Saul*, No. 18-CV-3026-LTS, 2019 WL 4696415, at *10 (N.D. Iowa Sept. 26, 2019); *Rollie v. Saul*, No. 18-CV-129-CJW-KEM, 2019 WL 4673220, at *10 (N.D. Iowa Sept. 25, 2019); *Dewbre v. Comm'r of Soc. Sec.*, No. 18-CV-4055-LRR, 2019 WL 4344288, at *6 (N.D. Iowa Sept. 12, 2019); *Sexton v. Saul*, No. C18-1024-LTS, 2019 WL 3845379, at *8 (N.D. Iowa Aug. 15, 2019); *Frazer v. Saul*, No. C18-2015-LTS, 2019 WL 3776996, at *4 (N.D. Iowa Aug. 12, 2019); *Murphy*, 2019 WL 2372896, at *7; *White v. Comm'r of Soc. Sec.*, No. C18-2005-LTS, 2019 WL 1239852, at *4 (N.D. Iowa Mar. 18, 2019); *Stearns v. Berryhill*, No. 17-CV-2031-LTS, 2018 WL 4380984, at *6 (N.D. Iowa Sept.14, 2018); *Davis v. Comm'r of Soc. Sec.*, No. 17-CV-80-LRR, 2018 WL 4300505, at *8-9 (N.D. Iowa Sept. 10, 2018); *Iwan v. Comm'r of Soc. Sec.*, No. 17-CV-97-LRR, 2018 WL 4295202, at *9 (N.D. Iowa Sept. 10, 2018); *Thurman v. Comm'r of Soc. Sec.*, No. 17-CV-35-LRR, 2018 WL 4300504, at *9 (N.D. Iowa Sept. 10, 2018).

In *Stearns*, this Court ruled as follows:

> The United States District Court for the Central District of California has considered *Lucia* in the Social Security context, holding that claimants have forfeited the Appointments Clause issue by failing to raise it during administrative proceedings. *See Trejo v. Berryhill*, Case. No. EDCV 17-0879-JPR, 2018 WL 3602380, at *3 n.3 (C.D. Cal. July 25, 2018). I find this holding to be consistent with [relevant precedent]. Stearns' argument that an issue need not be raised if the ALJ does not have authority to decide it does not hold water under *Lucia*. *Lucia* made it clear that, with regard to Appointments Clause challenges, only "one who makes a timely

challenge" is entitled to relief. *Lucia*, 138 S. Ct. at 2055 (quoting *Ryder*, 515 U.S. at 182-83).

> In *Lucia*, the Supreme Court acknowledged the challenge was timely because it was made before the Commission. *Id.* In the context of Social Security disability proceedings, that means the claimant must raise the issue before the ALJ's decision becomes final. . . . *Lucia* makes it clear that this particular issue must be raised at the administrative level.

> Because Stearns did not raise an Appointments Clause issue before or during the ALJ's hearing, or at any time before the ALJ's decision became final, I find that she has forfeited the issue for consideration on judicial review. As such, her request for remand on this basis is denied.

2018 WL 4380984, at **5–6 (paragraph break added).

Finally, although Claimant argues that raising the issue during the administrative process would have been futile because Social Security EM-18003 prevented the ALJ from addressing the issue (Doc. 12 at 14), nothing stopped Claimant from raising the issue during the administrative process and preserving it for appeal or attempting to raise it in an amended appeal since *Lucia* was decided three months prior to the Appeals Council's decision in her case. In addition, Claimant's argument that former Acting Commissioner Berryhill's authority lapsed between November 2017 and April 2018, leaving the SSA "without a principal officer with the power to appoint inferior officers" (*Id.* at 14) is unavailing for the same reason. Nothing prevented Claimant from raising this issue in her appeal or attempting to raise it in an amended appeal once *Lucia* was announced. I recommend the District Court affirm the ALJ's decision on this issue.

## IV.   CONCLUSION

For the foregoing reasons, I respectfully recommend that the District Court **affirm** the decision of the ALJ and **dismiss Plaintiff's case with prejudice**.

The parties must file objections to this Report and Recommendation within fourteen (14) days of the service of a copy of this Report and Recommendation, in

accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the District Court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

  **DONE AND ENTERED** this 3rd day of February, 2020.

                             _____

                           Mark A. Roberts, United States Magistrate Judge

                           Northern District of Iowa